# IN THE TENNESSEE COURT OF CRIMINAL APPEALS

## AT KNOXVILLE

## JULY 1999 SESSION

**FILED**

September 29, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 03C01-9801-CR-00036** |
| | ) | |
| Appellee, | ) | **KNOX COUNTY** |
| | ) | |
| VS. | ) | |
| | ) | **HONORABLE MARY BETH LEIBOWITZ** |
| **DENNIS WADE SUTTLES,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | **(First Degree Murder - Death Penalty)** |

**FOR THE APPELLANT:**

**LESLIE M. JEFFRESS**
501 Clinch Ave, Third Floor
P.O. Box 2664
Knoxville, TN 37901

**BRANDT W. DAVIS**
1707 Cove Creek Lane
Knoxville, TN 37919-8603

**FOR THE APPELLEE:**

**PAUL G. SUMMERS**
Attorney General & Reporter

**MICHAEL E. MOORE**
Solicitor General

**MICHAEL J. FAHEY II**
Assistant District Attorney General
425 Fifth Avenue, North
Cordell Hull Building, Second Floor
Nashville, TN 37243-0493

**RANDALL E. NICHOLS**
District Attorney General

**WILLIAM HARRISON CRABTREE
SALLY JO HELM**
Asst. District Attomeys General
400 Main Street
P.O. Box 1468
Knoxville, TN 37901-1468

**OPINION FILED:** _____

**CONVICTION AND SENTENCE OF DEATH AFFIRMED**

**JOE G. RILEY, JUDGE**

# O P I N I O N

In this capital case, the defendant, Dennis Wade Suttles, was convicted by a Knox County jury of first degree murder and sentenced to death. At the sentencing hearing, the jury found two aggravating circumstances: (1) the defendant was previously convicted of one or more felonies involving the use of violence, and (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. *See* Tenn. Code Ann. § 39-13-204(i)(2) and (5) (Supp. 1995). In this direct appeal as of right, defendant raises the following issues:

1. whether the evidence of premeditation is sufficient to support his first degree murder conviction;

2. whether the statutory definition of second degree murder is unconstitutionally vague;

3. whether the trial court erred by denying his request to distribute a questionnaire to the jury pool prior to *voir dire*;

4. whether the trial court erroneously limited defense counsel's questioning of potential jurors;

5. whether the trial court erred by refusing to allow defense counsel to review the psychological records of a state witness;

6. whether the evidence is sufficient to support the heinous, atrocious, or cruel aggravating circumstance; and

7. whether the death penalty statutes are unconstitutional.

We **AFFIRM** the conviction and sentence of death.

## TESTIMONY AT GUILT PHASE OF TRIAL

On March 13, 1996, the defendant murdered Patricia Gale Rhodes, his former fiancee, in the parking lot of the Taco Bell on Chapman Highway in Knoxville, Tennessee. The victim's 15-year-old daughter, Christina, witnessed this brutal murder.

2

The defendant first met the victim in April of 1995. The two began dating, and in October 1995, the defendant asked the victim to marry him. At that time, the victim's divorce was not final, so the engagement was delayed. In December 1995, the defendant purchased a house, and he and the victim moved in together, along with the victim's daughter, Christina. At Christmas, the defendant gave the victim an engagement ring.

The defendant testified that the victim knew about his prior convictions. In 1986, the defendant pled guilty to one count of felonious assault with bodily injury and three counts of assault with intent to commit first degree murder. These convictions were the result of the defendant attempting to force his former wife and 3-year-old son to come home with him. When his former father-in-law tried to intervene, the defendant shot him and forcibly took his former wife and son with him. One of these offenses was against a police officer who was attempting to apprehend the defendant.

The defendant's parole officer, Gwen Stargell, testified that on October 3, 1995, the victim came with the defendant for his monthly report. Stargell told the victim about the defendant's prior convictions and asked her to call if anything unusual occurred.

In February 1996, the couple had domestic problems. According to the defendant, they had an argument regarding the purchase of furniture, which led to the victim moving out three days later. The defendant testified that during the argument, he tried to take the engagement ring and broke the victim's necklace when his hand slipped. At the time the victim moved out, her co-workers indicated that the victim exhibited deep bruises on her neck that looked like fingerprints.

According to the defendant, he was upset by the victim's departure. Attempting to convince the victim to come back, the defendant called her at work several times. He was only able to talk with her once, and she told him not to call back. The defendant did not know where the victim moved and testified that he did not try to find out. He bought cards for her and would leave them on the windshield of her vehicle at work.

The victim was afraid of the defendant, who continued to call her at work and would wait for her in the parking lot of her place of employment. Karen Black, with whom the victim stayed, testified that the victim carried all of her financial papers in her purse so that if something happened to her, the papers could be found. The victim's co-workers refused to allow the defendant to speak with the victim, and they escorted her to her vehicle each evening after work.

One evening, the defendant tried to talk to the victim as she was leaving the parking lot. The victim rolled up her window and drove away, and another employee blocked the defendant's vehicle so that he could not follow her.

In March 1996, the same month of the murder, the defendant spotted the victim's vehicle and followed her to the hospital, where the victim was going to visit her father. According to the defendant, he talked to the victim, and the victim said that she would call him so they could talk about their relationship. After work, the defendant went back to the hospital parking lot and left some cards and mail on the windshield of the victim's vehicle.

On the day of the murder, the defendant, who was a roofer, worked all day at the Chili's Restaurant on Kingston Pike. The defendant testified that it was a normal day. The defendant's co-workers confirmed that the defendant worked all day; he did not seem angry or upset; and he did not make any threats about the victim. Neither co-worker noticed anything unusual about the defendant that day.

After work, the defendant went to his mother's residence and was invited to stay for dinner. The defendant decided that he needed to go home and clean up first. Lee Napier, the defendant's stepfather, confirmed that the defendant stopped by the house a little after 5 p.m. The defendant left the house around 5:30 p.m., and he did not appear different or angry at the time and did not say anything about the victim.

4

That same day, the victim picked up her daughter, Christina, and her friend, Arlisa, around 4 p.m. After going to the grocery store and waiting at a red light, they saw the defendant drive by, stop, and turn around at the second entrance of the grocery store. As soon as the light changed, the victim drove off quickly and successfully eluded the defendant. The victim then drove the girls to the Taco Bell, parking in the back to ensure that the defendant would not see her car. On the defendant's way back to his house before dinner, he stopped at the Walmart. As he was leaving the Walmart parking lot, he noticed the victim's vehicle at the Taco Bell and parked beside it.

The defendant entered the Taco Bell and came up to their booth. He and the victim argued loudly, and the defendant followed her outside. Amanda Reagan, a Taco Bell employee, confirmed that the defendant entered the restaurant and went directly to their table. She saw the defendant grab the victim's arm and try to make her leave with him.

Once outside, Christina and Arlisa got in the vehicle, while the victim and the defendant stood beside the vehicle and continued talking. At some point, the defendant grabbed the victim and prevented her from getting into her vehicle. When Christina got out, the defendant had one arm around the victim's neck and was holding a knife to her throat. He told Christina "Get back or I'll kill her." As Christina was stepping back, the victim told the defendant that she would go with him. The defendant put the knife in his pocket, saying that he was sorry. When the defendant let go, the victim ran toward the Taco Bell. The defendant followed her, tackled her, pulled out the knife, got on top of her, slashed her throat, and started stabbing her. Christina was approximately three feet away. During the attack, the victim was screaming for Christina to stay back.

The defendant testified that while they were talking outside, the victim told him that if he did not stay away, she would have him killed. The defendant grabbed the victim and told her not to threaten him. He had the knife at the victim's neck, but he did not intend to harm her. The defendant testified that he was a little angry at that time, but he was not ready to hurt anyone and was only reacting to the threat made by the victim. The

5

defendant let go of the victim and put his arms down. He apologized, and the victim told him he was a dead man. According to Christina, her mother did not make any threats. The defendant could not remember any of the subsequent events. Despite his alleged inability to remember doing bodily harm to the victim, the defendant admitted that he must have killed her.

Shawn Patrick Kane saw the couple fighting as he was walking out of the Food Lion. As he got into his truck, Kane saw the victim break away and the defendant chase and tackle her. Kane saw the defendant raising his hand in a striking motion toward the victim.

When Kane got to the Taco Bell parking lot, the victim was on the ground, and the defendant turned back toward Kane, looked at him, then "nonchalantly" got in his car and drove away. As Kane drove up, Christina saw the defendant get up, wipe off his knife, put it in his pocket, and leave. The defendant smiled at her as he drove by.

When Kane arrived, there was blood coming out of the victim's neck and back. The victim tried to get up but was unable to do so. Kane and a nurse who was at the scene tried to stop the bleeding. The victim said that she was choking, and as she tried to move, her neck split open and she started gurgling blood. Kane did not hear any further communication from the victim, but she was still trying to move when they put her in the ambulance. Kane wrote down the defendant's license plate number and gave it to the police.

Around 7 p.m., the defendant called a friend, Donna Rochat. He told her that he thought he had killed the victim after an argument in the parking lot of the Taco Bell. The defendant said that he stabbed the victim in the back, cut her throat, and stabbed her in the chest. Rochat told the defendant to turn himself in; however, he said that he could not do that. While the defendant seemed calm, he said that if he had a gun, he would kill himself.

6

Later that evening, the police located the defendant at his house. The officers observed the defendant coming from the direction of a field across from the house. When the defendant reached the residence, the officers arrested him. A knife with a wooden handle and a 3 ½ inch blade was found in the defendant's pocket. The defendant told the officers that his vehicle was parked at a church parking lot approximately one mile from the residence. The defendant was cooperative and seemed unemotional and indifferent.

Dr. Sandra K. Elkins, the Knox County Medical Examiner, performed the autopsy on the victim. She found numerous wounds on the surface of the body which were caused by a sharp instrument such as a knife. On the victim's face, there was an incise wound to the left side of the upper and lower lips. To the neck area, there were four major wounds. Three of these were stab wounds to the left side of the neck. The fourth wound was a large gaping slash on the right side of the neck. Dr. Elkins also found one stab wound just beneath the left breast and three stab wounds to the left front shoulder area. There were defensive wounds to the hands. Specifically, there were two cut wounds to the right hand and a superficial slash wound to the wrist. On the left hand, there was one slash wound across the front of the hand and a deeper cut wound to the inside of the thumb. There were six stab wounds ranging from the right upper back down to the left back region under the shoulder blade area. There were also some superficial wounds under the chin.

According to Dr. Elkins, the victim would have been alive at the time the wounds were produced, and no single wound would have caused the victim to lose immediate consciousness. The victim's larynx was damaged; however, the vocal chords were uninjured. She would have been able to speak, but the damage to the larynx would have made speech difficult.

In Dr. Elkins' opinion, the cause of death was multiple knife stab wounds. Specifically, the victim died of bleeding from vessels that were cut in the wound to the right side of the neck. This wound, which cut the victim's jugular vein and external carotid artery, would have caused death sooner than any of the other wounds. The other wounds

7

could have potentially caused death, given enough time and without medical treatment. In Dr. Elkins' opinion, the victim would have bled to death within 10 minutes from the wound to the right side of the neck. Application of pressure to the wound may have delayed the time of death by five minutes. At the time of the autopsy, it appeared that the victim had lost over half the volume of blood in her body. Consciousness would have tapered off within five to six minutes. Dr. Elkins was unable to tell which wound occurred first.

Lee Napier, the defendant's stepfather, testified that he had known the defendant for 35 years. During that time, he had never seen the defendant angry or upset with anyone. The defendant was easy to get along with and was always calm. The defendant lived with the Napiers for a year.

Dr. Jerry Matthews, a clinical psychologist, evaluated the defendant in 1991 and 1993 at the request of the Tennessee Board of Paroles. The purpose of his evaluations was to determine whether the defendant had active symptoms of mental disorders that needed to be treated, to determine the defendant's capacity to reoffend, and to recommend needed services if the defendant was to be paroled.

Based on his review of the defendant's history, he learned that the defendant was born at home as a "blue baby," meaning that he had to be resuscitated at birth. His older brother died of suffocation at the age of five. Shortly thereafter, the defendant's father left the family, and the defendant went to live with his paternal grandparents because his mother was unable to support him. The defendant's grandparents were strict, religious people, and his grandmother was the disciplinarian. The defendant dropped out of school around the seventh grade and went to work. He later received his GED. He was married at the age of 22. The marriage lasted for 12 years and produced one child. When the defendant was 32, his wife left him a note saying that she was leaving him. The defendant reacted by getting a pistol and going out to find her. His prior convictions resulted from this violent episode.

Based on his evaluation in 1991, it was Dr. Matthews' opinion at that time that the defendant presented a substantial risk of violent behavior if released on parole. The most risk would be when the defendant was involved in a heterosexual relationship. Dr. Matthews described the defendant as the type person who reacts to his present environment without thought or reflection. When the defendant is unable to control what is going on in his environment, it creates anxiety and puts the defendant at risk of being violent. Because the defendant was abandoned as a child, he is afraid of being alone. This creates fear and anxiety which overwhelms him. Having been born a "blue baby," the defendant also has a diminished capacity to deal with stress and is unable to control his emotions. This causes the defendant to become impulsive and unpredictable.

The defendant was denied parole in 1991. Between 1991 and 1993, the defendant attended anger management classes in prison. He was then released on parole in 1994.

Dr. Matthews also evaluated the defendant after the homicide at the request of defense counsel. In his opinion, the defendant was in a high state of emotional arousal at the time of the murder. Putting the knife to the victim's throat was for the purpose of intimidating her into coming back with him. When the victim said something that gave him reassurance, he released her. However, when the victim said that she would have him killed, that was the "straw that broke the camel's back." The defendant reacted impulsively, totally and intensively, and with violence, and without the ability to restrain himself. In Dr. Matthews' opinion, the murder was the result of basic, primitive emotions of anger, fear, and hurt, resulting in an impulsive and explosive act of violence.

Based on this proof, the jury found the defendant guilty of premeditated first degree murder.

9

**TESTIMONY AT SENTENCING PHASE OF TRIAL**

At the sentencing hearing, the state relied upon the proof at the guilt phase of the trial and only presented the indictments and judgments from the defendant's previous convictions. On January 6, 1986, the defendant pled guilty to one count of felonious assault with bodily injury and enhancement for use of a firearm against Lloyd Barnes, for which he was sentenced to 30 years plus 5 years for the enhancement; one count of assault with intent to commit first degree murder by use of a firearm against Nancy Suttles, for which he was sentenced to 5 years; one count of assault with intent to commit first degree murder while in the possession of a firearm against Brian Suttles, for which he was sentenced to 5 years; and one count of assault with intent to commit first degree murder by use of a firearm against Tim Trentham for which he was sentenced to 5 years.

The defendant presented his institutional records from the Tennessee Department of Correction. He was released from prison on July 27, 1994, and returned on March 20, 1996, just after the homicide. At the time of the defendant's parole, 29 recommendation letters were written by staff members at the correctional center. David Allen Sexton, the Social Warden of Operations at Northeast Correctional Complex, testified that the defendant had two write-ups during his time of incarceration. The first was in December 1990, for having contraband in his cell. Specifically, the defendant had in his possession a small drill bit, a small screwdriver, a utility blade, a wrench, two concrete nails, and three other nails. The defendant received a written reprimand. The defendant's other write-up was a violation of policy and procedures at the institution. Specifically, the defendant had in his possession a fan which had the name and inmate number scrubbed off.

During his entire time of incarceration, the defendant worked. His records do not reflect that he was violent as an inmate, and he reached "trusty" status. When the defendant was paroled, the warden and associate warden recommended it.

The defendant's mother, Lois Evelyn Napier, testified that the defendant was born at home. He was born breach and was a "blue baby." The defendant's father, Holbert Suttles, left when the defendant was about four. The defendant went to live with his paternal grandparents, who raised him. Mrs. Napier was unable to keep the defendant because she was working two jobs. The defendant did not get into trouble as a child. After the defendant was convicted of his previous offenses, Mrs. Napier and her husband visited him weekly in prison. When he was released on parole, the defendant lived with them. They did not have any trouble with the defendant. Mrs. Napier testified that she loved her son very much and wanted to help him. On the night of the murder, the defendant called her and asked if she would go to the Taco Bell to see if the victim was alive. The defendant was 44 years of age at the time of the murder.

Based on this proof, the jury found that (1) the defendant was previously convicted of one or more felonies involving the use of violence to the person, and (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. *See* Tenn. Code Ann. § 39-13-204(i)(2) and (5) (Supp. 1995). The jury determined that these aggravating circumstances outweighed any mitigating circumstances and sentenced the defendant to death.

## I. SUFFICIENCY OF THE EVIDENCE OF PREMEDITATION

The defendant contends that the evidence does not support a finding of premeditation. He asserts that the state failed to introduce any evidence that he had an opportunity to reflect upon his actions for any appreciable length of time after his mind was free from the influence of excitement or passion and further failed to establish a pre-existing plan to kill. We find that the evidence is sufficient to support the verdict.

### A. Standard of Review

A jury verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state's theory. State v. Williams, 657 S.W.2d 405, 410

(Tenn. 1983). On appeal, the state is entitled to the strongest legitimate view of the evidence and to all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Moreover, a guilty verdict removes the presumption of innocence which the appellant enjoyed at trial and raises a presumption of guilt on appeal. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The appellant has the burden of overcoming this presumption of guilt. *Id*.

In reviewing the sufficiency of the evidence, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e).

## B. Premeditation

At the time of the defendant's offense, first degree murder was defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1995). Under the statute, premeditation requires "the exercise of reflection and judgment," Tenn. Code Ann. § 39-13-202(d) (Supp. 1995), and "a previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citing McGill v. State, 475 S.W.2d 223, 227 (Tenn. Crim. App. 1971)). The purpose to kill does not necessarily have to pre-exist in the mind of the accused for any definite period of time. Instead, it is the accused's mental state at the time he or she allegedly decided to kill that must be considered in order to determine whether the accused was sufficiently free from excitement and passion to be capable of premeditation. Tenn. Code Ann. § 39-13-202(d) (Supp. 1995).

The element of premeditation is a question of fact to be resolved by the jury. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). "As is usually the case, a determination of a culpable mental

state, such as premeditation, must be inferentially made from the circumstances surrounding the killing." State v. Burlison, 868 S.W.2d 713, 717 (Tenn. Crim. App. 1993); *see also* Gentry, 881 S.W.2d at 3.

While there is no strict standard governing what constitutes proof of premeditation, Tennessee Courts have relied on the following circumstances in determining whether an inference of premeditation is supported: the use of a deadly weapon upon an unarmed victim; the victim was retreating or attempting to escape when shot; calmness immediately after the killing; and declarations by the defendant of his intent to kill. *See, e.g.*, State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); West, 844 S.W.2d at 148.

Other relevant factors from which a jury may infer premeditation include planning activities by the defendant prior to the killing, facts about the defendant's prior relationship with the victim from which motive may be inferred, and the nature of the killing. Gentry, 881 S.W.2d at 4-5 (citation omitted). "[T]he fact that repeated blows (or shots) were inflicted on the victim is not sufficient, by itself, to establish first-degree murder." State v. Brown, 836 S.W.2d 530, 542 (Tenn. 1992) (emphasis added); *see also* State v. Darnell, 905 S.W.2d 953, 962 (Tenn. Crim. App. 1995).

## C.  Analysis

We conclude the proof of premeditation is sufficient to support the jury's verdict. Specifically, the defendant grabbed the unarmed victim and held a pocket knife to her throat, telling the victim's daughter to "Get back or I'll kill her." After the victim indicated that she would go with him, the defendant released her and put the knife back in his pocket. Thereafter, as the victim attempted to flee from the defendant, he tackled her. He pulled the knife out of his pocket, opened it, stabbed and slashed the victim, and then turned her over and stabbed her several more times in the back. The medical examiner found twelve major wounds, defensive wounds to the hands, and other superficial wounds. The defendant wiped the knife off, put it in his pocket, "nonchalantly" walked back to his car, and drove away, smiling at the victim's daughter. While the proof does not necessarily

13

reflect that the defendant went to the Taco Bell with the intent to kill the victim, the proof supports a finding that he acted with premeditation at the time of the murder.

Defendant contends the testimony of Dr. Matthews establishes that he lacked the capacity to premeditate. Under State v. Hall, 958 S.W.2d 679 (Tenn. 1997), *cert. denied*, ___ U.S. ___, 118 S.Ct. 2348, 141 L.Ed.2d 718 (1998), "psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition." *Id.* at 690. At best, Dr. Matthews' testimony showed that the defendant is at risk of being violent when he is unable to control his environment, especially when he is rejected in a heterosexual relationship. Dr. Matthews testified that the defendant was in a high state of emotional arousal at the time of the murder and was unable to restrain himself. He did not testify that the defendant had a mental disease or defect which caused his mental state at the time of the murder. Under Hall, the testimony of Dr. Matthews was insufficient to show that the defendant had a diminished capacity to premeditate the murder. Moreover, as discussed above, in light of the factors which tend to show the existence of premeditation, the proof in this case overwhelmingly supports the jury's finding of guilt. .

## II. STATUTORY DEFINITION OF SECOND DEGREE MURDER

The defendant contends that the statutory definition of second degree murder is unconstitutionally vague and was incapable of clear definition by the trial court or understanding by the jury. Thus, the jury could not fully consider the charge of second degree murder. He contends that the absence of a true distinction between first degree murder and second degree murder deprived him of due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and by Article 1, § 8 of the Tennessee Constitution. We disagree.

14

In accordance with the definition of second degree murder, as set forth in Tenn. Code Ann. § 39-13-210 (Supp. 1995), the trial court gave the following instruction regarding second degree murder:

> Any person who commits second degree murder is guilty of a crime.
>
> For you to find the Defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements.
>
> 1. That the Defendant unlawfully killed the alleged victim, and
>
> 2. That the Defendant acted knowingly.
>
> The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.
>
> Bear in mind, that if you find a knowing killing with adequate provocation, that is voluntary manslaughter.
>
> A person acts intentionally when that person acts with a conscious objective either to cause a particular result, or to engage in particular conduct.
>
> A person acts knowingly if that person acts with an awareness, either that his or her conduct is of a particular nature, or that a particular circumstance exists.
>
> The requirement of knowingly is also established if it is shown that the Defendant acted intentionally.

The second degree murder statute was challenged in State v. Jerry Taylor, C.C.A. No. 01C01-9612-CC-00499 (Tenn. Crim. App. filed July 29, 1998, at Nashville), *perm. to app. denied* (Tenn. February 1, 1999), including an assertion that the statute failed to properly differentiate the varying degrees of homicide. In reviewing this claim, this Court held:

> In our view, the words of Tenn. Code Ann. § 39-13-210 are sufficiently precise to put an individual on notice of prohibited activities. The language sets out boundaries sufficiently distinct for the courts to fairly administer the law. See State v. Thomas, 635 S.W.2d 114, 116 (Tenn. 1982).

15

Slip op. at 8. While in State v. Jerry Taylor, the defendant was specifically concerned that the statute failed to differentiate between second degree murder and voluntary manslaughter, the same reasoning is applicable in the present case. In addition to being properly instructed on second degree murder, the jury was clearly instructed that first degree murder required a finding of premeditation, which was fully defined.

This issue is without merit.

### III. JURY POOL QUESTIONNAIRE

The defendant contends that the trial court erred by denying his motion requesting permission to distribute a jury questionnaire to the jury pool in advance of *voir dire* proceedings. We respectfully disagree.

Prior to trial, the defendant filed a "Motion to Order Administration of a Juror Questionnaire." The attached questionnaire contained 79 questions to be completed by potential jurors. It appears that after a hearing on the matter, the trial court denied the motion; however, a transcript of the hearing is not included in the record.

The goal of *voir dire* is to ensure that jurors "are competent, unbiased, and impartial, and the decision of how to conduct *voir dire* of prospective jurors rests within the sound discretion of the trial court." State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993); *see generally* State v. Harris, 839 S.W.2d 54, 65 (Tenn.1992). In the present case, the defendant does not allege that the jurors who served on his case were incompetent, biased, or partial. Moreover, the record does not reflect that the trial court abused its discretion by denying the defendant's request to use the jury questionnaire. *See* State v. Stephenson, 878 S.W.2d 530, 540 (Tenn. 1994) (trial court did not abuse its discretion in denying defendant's pre-trial motion to disseminate a detailed questionnaire to prospective jurors); State v. Smith, 857 S.W.2d 1, 20 (Tenn. 1993) (defendant failed to show prejudice as a result of denial of a motion to submit proposed questionnaire to prospective jurors prior to *voir dire*).

16

Accordingly, we find that this argument is without merit.

## IV. LIMITATION OF JUROR QUESTIONING

The defendant's contention that the trial court restricted his questioning of potential jurors is also without merit. During *voir dire* proceedings, after defense counsel had asked a number of questions to potential jurors, the state requested a bench conference. The state objected to the relevance of the questions being asked by defense counsel. At the end of the discussion, the trial court indicated that

> "at some point I'm going--I'm going to cut you off, and we're going to do rounds on these people. It's now [four] o'clock. Before we go forward I'm going to stand them up and let them stretch. They (sic) been in here for fifty minutes or so. If you use twenty--and I'm not suggesting you should--but if you have a lot more to ask -- in about ten or fifteen more minutes I'm probably going to cut you off."

At the end of the questioning of this particular group of jurors, another bench conference was held. The following discussion took place:

MR. JEFFRESS:     I want to--perhaps this is not the time, but I think that I have to object to being cut off on the *voir dire*.

THE COURT:        I haven't cut you off yet.

MR. JEFFRESS:     Well--

THE COURT:        I told you I was going to cut you off in fifteen minutes, but I wasn't.

MR. JEFFRESS:     Well, I feel like I have been.

THE COURT:        If you want to ask some other questions, you can do that.

MR. JEFFRESS:     No, I think we've done--(Inaudible phrase)

THE COURT:        Okay. Your objection is noted for the record and is recorded in support of this.

MR. JEFFRESS:     Okay.

The record reflects that the trial court did not cut off defense counsel's opportunity to question the potential jurors. Counsel was given a second opportunity to question the

17

potential jurors after raising his objection at the bench but did not do so. Accordingly, it was not the trial court that limited the questions asked by defense counsel.

This issue is without merit.

## V. PSYCHOLOGICAL RECORDS OF CHRISTINA RHODES

The defendant contends that the trial court erred by not allowing defense counsel to review the psychological treatment records of Christina Rhodes, the daughter of the victim, who witnessed the killing of her mother and who testified at trial on behalf of the state. The defense requested these records so they could cross-examine the witness regarding her competency and credibility both at the time of the offense and at trial. Specifically, the defendant asserts that without these records he was unable to effectively question her credibility, with particular reference to what she actually observed and heard at the time of the offense and how later psychological problems may have affected her memory as to those events. Upon review of the sealed records, we find that the trial court properly held that the psychological treatment records need not be disclosed.

Upon discovery that Ms. Rhodes had been seen by a psychologist after the death of her mother, the defense filed a "Motion to Compel Identification of Psychiatrist or Psychologist Treating Witness Christie Rhodes." The prosecution obtained the name of the psychologist from Christina's father. The defense then filed a subpoena for the treatment records, which the trial court granted. Before the records were delivered, the trial court indicated to defense counsel that it was willing to conduct an in camera examination of the records to determine whether "(a) there is anything exculpatory or (b) there is anything within those reports that would indicate some lack of reality, I guess is what you're looking for." Defense counsel indicated that the trial court was correct. Upon conducting an in camera examination of the records, the trial court made the following finding:

> [Christina] had some nightmares in the beginning and they got better and then flashbacks, nothing about what happened, nothing about

18

hallucinations, nothing about--she said she didn't remember her dreams. She didn't remember the nightmares when she woke up.

I'm not going to release the records, and I will put them under seal

...

In State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), our Supreme Court held that to ensure a defendant's right to cross-examine is not denied, trial courts should review psychiatric records of witnesses in camera to determine if the records are relevant in determining the witness' veracity. Id. at 333. In Middlebrooks, the trial court's failure to review the records was held to be harmless error because a review of the sealed records revealed that they contained very little information probative on the issue of credibility. Id. In the present case, the trial court properly reviewed the psychological records of Christina and determined that the information contained need not be disclosed to the defense. Having reviewed the psychological records, this Court agrees that the records need not be disclosed. They contain nothing exculpatory.

This issue is without merit.

## VI.  SUFFICIENCY OF EVIDENCE SUPPORTING
## HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATING CIRCUMSTANCE

The defendant argues that the proof does not support a finding of torture or serious physical abuse beyond that necessary to produce death. In response, the state contends that the proof, in the light most favorable to the state, supports a finding of both torture and serious physical abuse beyond that necessary to produce death. We find that the evidence is sufficient to support application of this aggravating circumstance.

### A.  Standard of Review

As previously stated, the jury's verdict, approved by the trial court, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the state's theory. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, "the State is entitled to the strongest legitimate view

19

of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). This Court does not reweigh or re-evaluate the evidence. *Id.* The jury's verdict, therefore, will only be disturbed if, after a consideration of the evidence in the light most favorable to the state, a rational trier of fact could not have found the existence of the aggravating circumstance beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. at 319, 99 S.Ct. at 2789; State v. Carter, 988 S.W.2d 145, 150 (Tenn. 1999).

## B. Torture/Serious Physical Abuse

Tenn. Code Ann. § 39-13-204(i)(5)(Supp. 1995) provides that the death penalty may be imposed if the state proves beyond a reasonable doubt that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Proof of either torture or serious physical abuse beyond that necessary to produce death is sufficient to support the aggravator.

"Torture" has been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985); *see also* State v. Pike, 978 S.W.2d 904, 917 (Tenn. 1998). In State v. Odom, 928 S.W.2d 18 (Tenn. 1996), our Supreme Court held that the term "serious physical abuse" as used in the aggravator means something distinct from "torture," that "serious" alludes to a matter of degree, and that the abuse must be physical and must be "beyond that" or more than what is "necessary to produce death." *Id.* at 26; *see also* State v. Nesbit, 978 S.W.2d 872, 887 (Tenn. 1998).

## C. Analysis

In the present case, the defendant inflicted twelve major wounds on the victim with a knife. Dr. Sandra K. Elkins found three stab wounds to the left side of the neck. A fourth wound was a large gaping slash that took up most of the right side of the neck, severing the victim's jugular vein and external carotid artery. Dr. Elkins also found one stab wound just beneath the left breast and three stab wounds to the left front shoulder area. There

20

were six stab wounds ranging from the right upper back down to the left back region under the shoulder blade area. Dr. Elkins testified that the victim was alive at the time of the wounds and would have bled to death within 10 minutes from the wound to the right side of the neck. Application of pressure to the wound may have delayed the time of death by five minutes. Consciousness would have tapered off within five to six minutes. *Compare* State v. Smith, 868 S.W.2d 561, 580 (Tenn. 1993). There is evidence of defensive wounds to the hands, suggesting that the victim was aware of and attempting to protect herself against the attack. *See* Pike, 978 S.W.2d at 917-18; State v. Sutton, 761 S.W.2d 763, 767 (Tenn. 1988); State v. Melson, 638 S.W.2d 342, 367 (Tenn. 1982). The victim's daughter testified that as the defendant was stabbing her, the victim was screaming for Christina to stay back. Kane, a bystander who attempted to assist the victim, testified that the victim said she was choking, and as she tried to move, the slash wound to her neck opened wide and she began gurgling blood. Her speech was also affected by a puncture of the larynx, which was allowing air to escape. The testimony showed that the victim continued to try to move as she was placed in the ambulance.

We conclude the evidence is sufficient to establish that the victim suffered severe physical and mental pain between the infliction of her wounds and death. *See* Carter, 988 S.W.2d at 150. Thus, the element of "torture" was proven. Furthermore, we conclude the evidence was sufficient to establish that the brutal physical abuse inflicted upon the victim was indeed "excessive" and far beyond that necessary to produce death. *See* Nesbit, 978 S.W.2d at 887. Thus, the element of "serious physical abuse beyond that necessary to produce death" was proven.

This issue is without merit.

## VII.  CONSTITUTIONALITY OF THE DEATH PENALTY STATUTE

The defendant raises several challenges to the constitutionality of Tenn. Code Ann. § 39-13-204 (Supp. 1995).  These arguments have been rejected repeatedly by our Supreme Court.

### A.  Cruel and Unusual Punishment

First, the defendant contends that death by electrocution or any means is cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Article 1, § 16 of the Tennessee Constitution.  The argument that death by electrocution is cruel and unusual punishment was rejected in State v. Black, 815 S.W.2d 166, 179 (Tenn. 1991).  Moreover, our Supreme Court has repeatedly reaffirmed its holding.  *See* State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994); State v. Howell, 868 S.W.2d 238, 258 (Tenn. 1993); State v. Smith, 857 S.W.2d 1, 23 (Tenn. 1993); State v. Bane, 853 S.W.2d 483, 489 (Tenn. 1993).

In 1998, our Legislature gave defendants sentenced to death the option of lethal injection.  *See* Tenn. Code Ann. § 40-23-114 (Supp. 1998).  While our Courts have not addressed the issue of whether lethal injection constitutes cruel and unusual punishment, such challenges have been rejected by the federal courts.  *See* LaGrand v. Stewart, 133 F.3d 1253, 1264-65 (9th Cir. 1998); Poland v. Stewart, 117 F.3d 1094, 1104-05 (9th Cir. 1997); Kelly v. Lynaugh, 862 F.2d 1126, 1135 (5th Cir. 1988); Woolls v. McCotter, 798 F.2d 695, 698 (5th Cir. 1986).  We likewise conclude that lethal injection is not constitutionally prohibited.

### B.  Heinous Aggravating Circumstance

Next, the defendant contends that the broad scope, interpretation, and lack of definitions of pertinent and controlling provisions of the aggravating circumstances listed in Tenn. Code Ann. § 39-13-204(i)(Supp. 1995) fail to limit the jury's exercise of discretion or provide a meaningful basis for narrowing the population of those convicted of first

22

degree murder to those eligible for the death penalty. Specifically, the defendant submits that the heinous, atrocious, or cruel aggravating circumstance fails to sufficiently narrow the scope of death-eligible defendants.

Our Supreme Court rejected similar contentions in analyzing the former version of this aggravating circumstance, Tenn. Code Ann. § 39-2-203(i)(5) (1982), which read: "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." *See* Black, 815 S.W.2d at 181-82; State v. Barber, 753 S.W.2d 659, 670 (Tenn. 1988). Likewise, our Courts have rejected this contention with respect to the current version of the statute, Tenn. Code Ann. § 39-13-204(i)(5), which reads: "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." *See* Nesbit, 978 S.W.2d at 887; Odom, 928 S.W.2d at 26.[1]

---

[1]Moreover, even if this version of the heinous, atrocious, or cruel aggravating circumstance were held to be unconstitutional, it would be harmless error in this case. *See* State v. Howell, 868 S.W.2d 238 (Tenn. 1993). In Howell, the Supreme Court set forth factors to consider in determining whether application of an inappropriate aggravating circumstance was harmless error:

    (1)    the number and strength of remaining valid aggravating circumstances;
    (2)    the prosecutor's argument at sentencing;
    (3)    the evidence admitted to establish the invalid aggravator; and
    (4)    the nature, quality, and strength of the mitigating evidence.

*Id*. at 261.

In applying these factors, the Court recognized that "more crucial than the sum of the remaining aggravating circumstances is the qualitative nature of each circumstance, its substance and persuasiveness, as well as the quantum of proof supporting it." *Id*. This is particularly true of the prior violent felony aggravator, and its effect and qualitative persuasiveness increases where there is proof, as in this case, of more than one prior violent felony conviction. State v. Nichols, 877 S.W.2d 722, 738 (Tenn. 1994). More recently, our Supreme Court has said,

[A] defendant's prior conviction for second-degree murder is a significant element to be considered in our analysis [of a death penalty sentence]; in fact, we have affirmed the death sentence in all but one previous case in which a prior violent felony conviction supported the aggravating factor in Tenn. Code Ann. § 39-2-203(i)(2).

State v. Boyd, 959 S.W.2d 557, 561 (Tenn. 1998)(commenting that the "remaining case" involved a prior offense of voluntary manslaughter, "a lesser grade of offense than second-degree murder")(citations to cases omitted), *cert. denied*, ___ U.S. ___, 119 S.Ct. 116, 142 L.Ed.2d 93 (1998).

Based upon our review of the factors set forth in Howell, this Court finds that even if application of the heinous, atrocious, and cruel aggravator were unconstitutional, such error was harmless in sentencing the defendant to death. In so finding, we note that the defendant has four prior convictions for felonies involving the use of violence to the person.

23

### C. Limitation on Jury's Discretion

Next, the defendant contends that Tenn. Code Ann. § 39-13-204 (Supp. 1995) fails to sufficiently limit the exercise of the jury's discretion. Specifically, he contends that once the jury finds that an aggravating circumstance applies, it has unbridled discretion to impose a death sentence regardless of the proof of mitigation. This argument was rejected in State v. Smith, 857 S.W.2d at 21-22; see also Franklin v. Lynaugh, 487 U.S. 164, 178-80, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988); State v. Hurley, 876 S.W.2d 57, 69 (Tenn. 1993).

Next, the petitioner contends that Tenn. Code Ann. § 39-13-204(g)(Supp. 1995) requires the jury to impose the death penalty if it finds that the aggravating circumstances outweigh the mitigating circumstances in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article 1, §§ 8 and 16 of the Tennessee Constitution. The defendant argues that the jury is discouraged from making the ultimate determination that the death penalty is the appropriate sentence in any specific case and is instructed not to consider sympathy.

The argument that the statute fails to require the jury to make the ultimate determination of whether death is the appropriate penalty in a specific case has been rejected by the Supreme Court. See State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994); Smith, 857 S.W.2d at 22. Moreover, arguments regarding the "no-sympathy" instruction have been rejected. See Brimmer, 876 S.W.2d at 83; Howell, 868 S.W.2d at 257; State v. Boyd, 797 S.W.2d 589, 596-98 (Tenn. 1990).

Next, the defendant asserts that Tenn. Code Ann. § 39-13-204 (Supp. 1995) is unconstitutional because it does not inform the jury in specific terms of its ability to impose a life sentence out of mercy. This argument has been rejected by our Supreme Court. See State v. Bigbee, 885 S.W.2d 797, 813-14 (Tenn. 1994); Melson, 638 S.W.2d at 366.

### D. Consequence of Failing to Reach Verdict

Finally, the defendant contends that Tenn. Code Ann. § 39-13-204 (Supp. 1995) is unconstitutional because it prohibits the jury from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase. Pursuant to Tenn. Code Ann. § 39-13-204(h) (Supp. 1995), the jury is not to be informed of the effect of its inability to unanimously agree on a punishment. Our Supreme Court has repeatedly upheld this provision of the statute. *See* Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 22-23; Barber, 753 S.W.2d at 670-71.

## VIII. PROPORTIONALITY REVIEW

### A. Standard of Review

Although not raised by the defendant, pursuant to Tenn. Code Ann. § 39-13-206(c)(1)(D), a comparative proportionality review must be undertaken in capital cases. In conducting a comparative proportionality review, the Court must begin with the presumption that the sentence of death is proportionate to the crime of first degree murder. Hall, 958 S.W.2d at 699. A death sentence will be considered disproportionate if, when taken as a whole, the case is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." State v. Bland, 958 S.W.2d 651, 665 (Tenn. 1997). A sentence of death, however, is not disproportionate merely because the circumstances are similar to those in another case in which a defendant received a life sentence. Hall, 958 S.W.2d at 699. The role of this Court in conducting comparative proportionality review is to assure "that no aberrant death sentence is affirmed," not to assure that a sentence "less than death has never been imposed in a case with similar characteristics." *Id.*

In comparing similar cases, the Court must consider many factors, including (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical, and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence

of justification; and (9) the injury to and effects on nondecedent victims.  Bland, 958 S.W.2d at 667.

In comparing similar defendants, the Court must consider variables such as: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional, or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of the victim(s); and (8) the defendant's capacity for rehabilitation.  *Id.*

"Comparative proportionality review is not a rigid, objective test."  *Id.* at 668.  This Court does not need to "employ a mathematical formula or scientific grid."  Hall, 958 S.W.2d at 699.  Rather, in using these factors to compare the circumstances of this case to other death penalty cases, this Court must rely upon "the experienced judgment and intuition of its own members."  Bland, 958 S.W.2d at 668.

### B.  Analysis of Similar Cases

In State v. Smith, 868 S.W.2d 561 (Tenn. 1993), the defendant shot, stabbed and cut the throat of his estranged wife.  Two other victims, the defendant's step-children, were also killed at the same time in a similarly violent manner.  Like the defendant in this case, Smith was a white male approximately 40 years of age at the time of the murder.  One of the aggravating circumstances found by the jury to support the sentence of death was the previous version of (i)(5) -- that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind."  Tenn. Code Ann. § 39-2-203(i)(5)(1982).

In State v. Johnson, 743 S.W.2d 154 (Tenn. 1987), the defendant murdered his wife by suffocation.  The victim would have been conscious from one to four minutes as the defendant forced a large plastic garbage bag into her mouth.  The aggravating circumstances found by the jury to support the sentence of death were (i)(2) -- the defendant was previously convicted of one or more felonies involving the use of violence

26

and the previous form of (i)(5) -- that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2-203(i)(2) and (5)(1982).

In State v. Hines, 919 S.W.2d 573 (Tenn. 1995), the 24-year-old white male defendant stabbed the female victim to death. There were three lethal stab wounds to the victim's chest, three slight stab wounds to the neck, and defensive wounds on the victim's hands. The aggravating circumstances found by the jury to support the sentence of death were (i)(2) -- the defendant was previously convicted of one or more felonies involving the use of violence, and (i)(5) -- the murder was especially heinous, atrocious, or cruel. The defendant claimed as mitigation that he was under extreme mental or emotional disturbance.

In State v. Jon Douglas Hall, No. 02C01-9703-CC-00095 (Tenn. Crim. App. filed April 29, 1998, at Jackson), the 30-year-old white male defendant beat his estranged wife causing serious trauma to various parts of her body, including the neck. She was then dragged to the backyard and put in the swimming pool face down to drown. The cause of death was strangulation and/or drowning. The defendant's children were present and witnessed part of the beating. One of the aggravating circumstances found by the jury was that the murder was especially heinous, atrocious, or cruel. Tenn. Code Ann. § 39-2-203(i)(5).

In State v. Harries, 657 S.W.2d 414 (Tenn. 1983), the 31-year-old male defendant shot and killed a female clerk during the robbery of a convenience store. The jury imposed the death penalty upon a finding that the defendant was previously convicted of one or more felonies involving the use of violence. The jury also applied the felony murder aggravating circumstance; however, the Supreme Court held this to be harmless error.

In State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998), *cert. denied*, ___ U.S. ___, 119 S.Ct. 343, 142 L.Ed.2d 283 (1998), the 23-year-old defendant murdered the female victim

27

during a robbery of the victim's home. The aggravating circumstances found by the jury were (i)(2) -- the defendant was previously convicted of one or more felonies involving the use of violence, and (i)(7) -- the murder was committed during the commission of a felony. Although the Supreme Court held that it was error to rely upon the felony murder aggravating circumstance, the Court held the error to be harmless beyond a reasonable doubt. The defendant had two previous convictions of attempted second degree murder and one previous conviction of aggravated robbery.

In State v. Howell, 868 S.W.2d 238 (Tenn. 1993), the defendant shot and killed a clerk during the robbery of a convenience store. The aggravating circumstances found by the jury were (i)(2) -- the defendant was been previously convicted of one or more felonies involving the use of violence and (i)(7) -- the murder was committed while the defendant was engaged in committing a felony. Although application of the felony murder aggravator was error, the Supreme Court applied a harmless error analysis and affirmed the death sentence. *Id.* at 260-62. The defendant had prior convictions for first degree murder, armed robbery, and attempted first degree murder.

In State v. Nichols, 877 S.W.2d 722 (Tenn. 1994), the jury found that the defendant had five prior convictions for aggravated rape and that the murder was committed during the commission of a felony. The Supreme Court held that application of the felony murder aggravator was harmless error and upheld the sentence of death. *Id.* at 737-39.

In State v. Roy Keough, No. 02C01-9708-CR-00317 (Tenn. Crim. App. filed January 13, 1999, at Jackson), transferred, No. 02S01-9901-CR-00009 (Tenn. January 27, 1999), the defendant accosted his estranged wife and her friend in a lounge in Memphis. The three were asked to leave after an argument. In the parking lot, the defendant stabbed the victims with a bayonet. His wife was sitting in her car at the time he stabbed her in the throat. The aggravating circumstance found by the jury to support the sentence of death was that the defendant had previously been convicted of one or more prior felonies involving violence. Tenn. Code Ann. § 39-2-203(i)(2). The defendant, a divorced white

male, was 51 years of age at the time of the murder. He raised as a mitigating circumstance that he was under extreme mental or emotional disturbance at the time of the murder. The death penalty was affirmed.

## C. Our Determination

While "[n]o two cases are alike, and no two defendants are alike," State v. Barber, 753 S.W.2d at 665, the above-mentioned cases bear many similarities with the case now before the Court. Based on these similarities, the imposition of the death penalty is not aberrant, nor is its application to the defendant arbitrary, excessive or disproportionate.

## CONCLUSION

Our review of the record indicates the defendant received a fair trial, was justly convicted, and was sentenced to death by the jury. Concluding there is no error in the record before this Court, we **AFFIRM** the conviction and sentence of death.

_____
**JOE G. RILEY, JUDGE**

**CONCUR:**

_____
**GARY R. WADE, PRESIDING JUDGE**

_____
**DAVID H. WELLES, JUDGE**

29